**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| FRONTIER NORTH INC., | ) | |
| | ) | |
|     Plaintiff/Counter Defendant, | ) | |
| | ) | |
| v. | ) | Cause No. 1:20-CV-281-HAB |
| | ) | |
| INTERNATIONAL BROTHERHOOD | ) | |
| OF ELECTRICAL WORKERS, | ) | |
| LOCAL 723, | ) | |
| | ) | |
|     Defendant/Counter Plaintiff. | ) | |

**OPINION AND ORDER**

Leaving Australia is the hardest thing I have ever done.

*- Barry Gibb*

With all due respect to the former British penal colony, the eldest Bee Gee has never tried to overturn a labor arbitration order in federal court. Plaintiff Frontier North, Inc. ("Frontier"), displeased by the outcome of the arbitration order sustaining a grievance filed by Defendant International Brotherhood of Electrical Workers, Local 723 (the "Union"), is now before the Court attempting the legal equivalent of climbing Everest. Despite Frontier's best efforts, the Court concludes that the arbitrator's order withstands judicial review. As such, judgment will be entered in favor of the Union.

**A.      Factual Background**

In 2010, Frontier purchased certain telecommunication assets in Indiana from Verizon. Along with those assets, Frontier inherited three collective bargaining agreements with the Union: the IBEW Local 723 Indiana White Book Agreement (the "White Book"); the IBEW Local 723

Indiana Statewide Construction Agreement (the "Blue Book"); and the IBEW Local 723 Red Book Agreement (the "Red Book").

Frontier continued Verizon's practice of using non-union construction contractors to supplement the work of its union employees, known as Construction Techs. For union employees covered by the White and Blue Books, Frontier's use of contractors was governed by Section 13.1 of those agreements. That section provided:

13.1    **Nothing in this Agreement shall be construed to limit the Company in the employment of such contract labor as in the discretion of the Company may become necessary for the proper construction, installation, maintaining and support of communication facilities owned, served and/or operated by the Company for the rendition of proper and adequate communication service to the Public.  The Company shall not, however, enter into any contractual arrangement for the construction, installation, and current maintaining and support of communication facilities as may result in the layoff and/or part-timing of its employees customarily performing work of the same nature as that to be provided under the contractual arrangement.**

(ECF No. 34-1 at 5).

From the time of the acquisition through the date of the arbitration hearing, Frontier's financial situation deteriorated through a combination of technological advances and poor business decisions. As a result, Frontier drastically cut expenses, including payroll costs. Frontier terminated almost 50% of its non-union workforce in Indiana. To reduce its union workforce, Frontier offered what amounted to financial incentives for those employees to quit, known as an ISP. Frontier offered an ISP to approximately 2,700 union employees in May 2017, including its Construction Techs. Frontier had hoped that eight of the Union-represented Construction Techs would accept the ISP, but only six took it up on its offer. Frontier did not replace any of those six employees.

2

The Union filed the grievance in this case on June 25, 2017, alleging that Frontier had violated the CBAs by using contractors while refusing to staff the vacated Construction Tech positions. The parties selected Arbitrator Robert J. Vana to arbitrate the dispute, and hearings were held on May 28, 2019, and January 7, 2020. Arbitrator Vana issued his Opinion and Award on May 11, 2020. Arbitrator Vana concluded that Frontier's use of contractors, under the circumstances presented, was a violation of Section 13.1 of the White and Blue Books. Accordingly, he directed Frontier to "backfill" the three positions vacated by union employees whose employment was governed by those CBAs. He further concluded that Frontier had not violated the Red Book, so no relief was awarded with respect to the three positions vacated under that CBA.

Frontier instituted the instant lawsuit on August 7, 2020, seeking to overturn Arbitrator Vana's Opinion and Award. Now before the Court are cross-motions for summary judgment filed by the parties. (ECF No. 33, 35). Both motions are fully briefed and ripe for determination.

**B.    Legal Analysis**

**1.    *Summary Judgment Standard***

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and

inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Additionally, a court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

The fact that the parties have filed cross-motions for summary judgment does not alter the standard. When evaluating each side's motion, the court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

2.   *Judicial Review of Labor Arbitration Orders*

Arbitration decisions receive a "hospitable reception" in federal court, and then some. *See Butler Mfg. Co. v. United Steelworkers of Am.*, 336 F.3d 629, 630 (7th Cir. 2003). Courts show "extreme deference" to an arbitrator's award in a dispute about a collective bargaining agreement. *See United Food and Commercial Workers, Local 1546 v. Illinois-American Water Co.*, 569 F.3d 750, 754 (7th Cir. 2009). The Seventh Circuit has described judicial review of an arbitration

decision as "severely limited," "extremely narrow," and "extraordinarily deferential." *See Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc*., 935 F.2d 1501, 1505 (7th Cir. 1991); *Ethyl Corp. v. United Steelworkers of Am*., 768 F.2d 180, 183 (7th Cir. 1985); *Ameren Illinois Co. v. Int'l Bhd. of Elec. Workers*, 906 F.3d 612, 616 (7th Cir. 2018).

Second-guessing the merits of an arbitrator's decision is off the table. Courts have "no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." *United Steelworkers of Am. v. Am. Mfg. Co*., 363 U.S. 564, 568 (1960). "Federal courts do not review the soundness of arbitration awards." *Chicago Typographical Union No. 16*, 935 F.2d at 1504–05. Judicial deference applies even if the "court is convinced [the arbitrator] committed [a] serious error" of fact or law in reaching the decision. *See Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam).

Judicial review of a labor arbitration award typically is "confined" to the "narrow question" of "whether the arbitrator's reasoning draws its essence from the parties' agreement." *See Unite Here Local 1 v. Hyatt Corp*., 862 F.3d 588, 600 (7th Cir. 2017); *see also United Steelworkers of Am. v. Enterprise Wheel & Car Corp*., 363 U.S. 593, 597 (1960). An arbitrator's decision "draws its essence from the contract if it is based on the arbitrator's interpretation of the agreement, correct or incorrect though that interpretation may be." *United Food*, 569 F.3d at 754. It is enough that the "arbitrator's interpretation can in some rational manner be derived from the collective bargaining agreement." *Nat'l Wrecking Co. v. Int'l Bhd. of Teamsters, Local 731*, 990 F.2d 957, 960 (7th Cir. 1993).

The question "is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred

in interpreting the contract; it is whether they interpreted the contract." *Hill v. Norfolk and Western Ry. Co.*, 814 F.2d 1192, 1195 (7th Cir. 1987). And "[i]f they did, their interpretation is conclusive." *Id*. A party "will not be heard to complain merely because the arbitrators' interpretation is a misinterpretation." *Id*. Once the court is satisfied that the arbitrator interpreted the agreement, "judicial review is at an end." *Id*.

"Indeed, our review is 'close to nonexistent' if the arbitrator 'interprets' rather than 'revises' the collective bargaining agreement." *Monee Nursery & Landscaping Co. v. Int'l Union of Operating Engineers*, 348 F.3d 671, 675 (7th Cir. 2003) (quoting *Ladish Co. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 10*, 966 F.2d 250, 252 (7th Cir. 1992)) (internal quotation omitted). If in doubt about whether the arbitrator interpreted the contract, courts affirm the award. "We resolve any reasonable doubt about whether an award draws its essence from the collective bargaining agreement in favor of enforcing the award." *American Postal Workers Union v. Runyon*, 185 F.3d 832, 835 (7th Cir. 1999); *Polk Bros., Inc. v. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent)*, 973 F.2d 593, 597 (7th Cir. 1992). The tie goes to the arbitrator.

Courts defer to arbitration decisions because that's what the parties bargained for – a resolution of disputes through arbitration, not litigation. *See Enterprise Wheel & Car Corp.*, 363 U.S. at 599; *Northern Indiana Pub. Serv. Co. v. United Steelworkers of Am.*, 243 F.3d 345, 347 (7th Cir. 2001). Otherwise, "arbitration would just be the first of a series of steps that always culminated in court litigation, and it would lose its *raison d'être*." *Butler*, 336 F.3d at 632. "Arbitrators do not act as junior varsity trial courts where subsequent appellate review is readily available to the losing party." *Nat'l Wrecking Co.*, 990 F.2d at 960.

Another "reason[] for insulating arbitral decision from judicial review" is the "decided preference for private settlement of labor disputes without the intervention of government." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37 (1987); *see also Butler*, 336 F.3d at 630 (noting that deferential judicial review allows arbitrators to "play their role of reducing industrial strife and maintaining a harmonious workplace"); *see also Ameren Illinois Co.*, 906 F.3d at 616–17 ("This extraordinarily deferential standard of review is grounded in courts' respect for the role of the labor arbitrator in administering 'a system of industrial self-government.' ") (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co*., 363 U.S. 574, 580 (1960)).

The window for judicial review is narrow, but not closed. The Labor Management Relations Act grants jurisdiction to federal courts to determine whether the arbitrator "exceeded the scope of his submission." *See Ameren Illinois Co.*, 906 F.3d at 617; *see also* 9 U.S.C. § 10(a)(4) (authorizing district courts to vacate an arbitration award when the "arbitrators exceeded their powers"). A court has the power to vacate an award if the "arbitrator had exceeded the powers delegated to him by the parties." *See Dexter Axle Co. v. Int'l Ass'n of Machinists*, 418 F.3d 762, 768 (7th Cir. 2005). That delegated power is typically limited to interpreting the contract. *See U.S. Soccer Federation, Inc. v. U.S. National Soccer Team Players Assoc*., 838 F.3d 826, 832 (7th Cir. 2016). If "there is no possible interpretive route to the award," then a "noncontractual basis can be inferred and the award set aside." *Chicago Typographical Union No. 16*, 935 F.2d at 1505–06.

An arbitrator "is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice." *Enterprise Wheel & Car Corp*., 363 U.S. at 597. An arbitrator's "source of authority" is the collective bargaining agreement, and he or she "has no general authority to invoke public laws that conflict with the bargain between the parties." *Alexander v. Gardner-Denver Co*., 415 U.S. 36, 53 (1974); *see also*

*Chicago Typographical Union No. 16*, 935 F.2d at 1505 ("The arbitrator is not free to think or to say, 'The contract says X, but my view of sound policy lead[s] me to decree Y.'"). That is, "[i]t is only when the arbitrator must have based his award on some body of thought, or feeling, or policy, or law that is outside the contract . . . that the award can be said not to 'draw its essence from the [CBA].'" *Arch of Illinois, Div. of Apogee Coal Corp. v. District 12, United Mine Workers of Am*., 85 F.3d 1289, 1292 (7th Cir. 1996) (emphasis in original) (quoting *Ethyl Corp.*, 768 F.2d at 184– 85).

Still, the Supreme Court used a strong word to describe what it takes for an arbitrator to step out of bounds: "infidelity." *See Enterprise Wheel & Car Corp*., 363 U.S. at 597. "When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *Id*. (emphasis added). Not merely wrong. Not misguided. Not unpersuasive or illogical. Unfaithful to the mission at hand.

Simply put, arbitrators "exceed their jurisdiction if they fail to interpret the collective bargaining agreements between the parties . . .. They do not exceed their jurisdiction if they make a mistake in interpreting a collective bargaining agreement." *Brotherhood of Locomotive Engineers and Trainmen, General Committee of Adjustment, Central Conference v. Union Pac. R.R. Co*., 719 F.3d 801, 803 (7th Cir. 2013). What's required is not the correct decision, but an "honest decision." *Nat'l Wrecking Co.*, 990 F.2d at 960.

**3.      *The Opinion and Award Draws its Essence from the CBAs***

Although the Opinion and Award is thirty-two pages in length, the decision, at least with respect to the White and Blue Books, is straightforward. Arbitrator Vana concluded that the CBAs limited Frontier in its use of contract labor to those situations where, as expressly provided in Section 13.1, it was "necessary for the proper construction, installation, maintaining and support

of communication facilities owned, served and/or operated by the Company for the rendition of proper and adequate communication service to the Public." (ECF No. 34-1 at 5, 23). In this case, Arbitrator Vana concluded:

> the subcontracting of the transferred work was not necessary for the proper construction, installation, maintaining and support of the communication facilities, because that work was being performed by the bargaining unit. In this case, the Work Transfer was to the sole result of an expense reduction initiated by the Company.

(*Id*. at 27–28). Thus, Arbitrator Vana concluded that Frontier's use of subcontractors to perform the work of Construction Techs that had accepted an ISP was "a violation of Article 13.1." (*Id*. at 28).

Whatever one thinks of the merits of the decision, the fact that it relies on the language of the CBAs, and finds a violation of that language, is strong evidence that the decision draws its essence from the CBAs. Frontier, however, disagrees. Frontier raises three challenges to the decision, all of which the Court finds to be without merit.

a.    *The Opinion and Award is not Based on the Implied Covenant of Good Faith and Fair Dealing*

Frontier first asserts that Arbitrator Vana relied on the implied covenant of good faith and fair dealing to disregard the language of the CBAs. Frontier points to four different references to the implied covenant in the decision as evidence that the implied covenant "infected every aspect of the Award." (ECF No. 34 at 17). In Frontier's view, then, the Opinion and Award draws its essence from the implied covenant, not the CBA.

The parties spend a considerable amount of time arguing over Arbitrator Vana's ability to rely on the implied covenant, but the Court finds this dispute immaterial. Arbitrator Vana's actual decision, excised from his general discussion of the implied covenant, was that Frontier's conduct

violated Article 13.1 of the CBAs. (ECF No. 34-1 at 28). He may have been "mindful" of the implied covenant, but he plainly did not rely on the implied covenant in making his decision.

The conclusion becomes inescapable when one compares Arbitrator Vana's decision on the White and Blue Books to the decision on the Red Book. The companion provision in the Red Book to Article 13.1 of the White and Blue Books was Article 24.1. That provision provided, "[t]he Company may contract out work as long as such contracting does not result in either layoff or part-timing of employees." (*Id*. at 29). As Arbitrator Vana noted, the requirement that contracting be "necessary for the proper construction, installation," etc. of Frontier's lines is absent from the Red Book provision. (*Id*). Because that additional requirement was absent, Arbitrator Vana concluded that Frontier did not violate the Red Book. (*Id*. at 33).

What this comparison shows the Court is that Arbitrator Vana carefully considered the language of the CBAs in reaching his conclusions. His decision on the differing sets of CBAs hinged on the presence or absence of specific contractual language. Frontier obviously disagrees with the conclusion Arbitrator Vana reached, but that does not mean that the decision was based on something other than the CBAs.

Frontier's argument highlights the danger in examining the language of an arbitration order too closely. "Arbitrators are not required to write opinions, any more than juries are." *Chicago Typographical Union No. 16*, 935 F.2d at 1506. It would be a "serious practical mistake" to "subject the reasoning in arbitrators' opinions to beady-eyed scrutiny" because it would create a disincentive to writing them at all. *Id*.; *see also Enterprise Wheel & Car Corp*., 363 U.S. at 598 ("Arbitrators have no obligation to the court to give their reasons for an award. To require opinions free of ambiguity may lead arbitrators to play it safe by writing no supporting opinions.").

Courts must not examine an arbitrator's phraseology under a judicial microscope. *See Butler*, 336 F.3d at 636 ("[I]t is worth reiterating that a court's review of an arbitral award does not proceed under the same principles that would apply if it were reviewing a decision of the Social Security Administration or a bankruptcy court."). The enterprise is especially fraught with peril when, as here, a party relies on bits and pieces of a decision to construct an entire line of argument. Absent a demonstration of infidelity, a passing phrase should not turn into a "gotcha" moment for overturning an arbitrator's award.

**b.**     *The Opinion and Award did not Improperly Arbitrate the ISP*

Frontier next complains about what it views as the improper arbitration of the ISP. To be sure, the ISP was beyond the scope of the arbitration. (ECF No. 34-1 at 74). However, the Court struggles to see how the Opinion and Award could be construed as an arbitration of the ISP. Instead, this seems to be another instance of Frontier identifying excerpts of the decision for "gotcha" treatment at the expense of a full understanding of the arbitral decision.

Frontier seems primarily concerned by Arbitrator Vana's description of the ISP as the "but for" cause of the grievance. (*See* ECF No. 34 at 26). But, as a practical matter, the ISP was the "but for" cause of the grievance in the sense that there are no Construction Tech positions to fill if the previously employees had not accepted the ISP. The Court sees no error in Arbitrator Vana stating the obvious, and Frontier points the Court to no authority that would limit an arbitrator from referencing matters outside of the arbitration in his award.

Arbitrator Vana's accurate description of the ISP aside, Frontier's argument is premised on an out-of-context excerpt from the Award and Opinion. Frontier calls out for scrutiny the following sentence from the decision: "However, the Company's exercise of the Broad ISP Authority must be exercised in conjunction with the specific requirements of the CBAs." (ECF

No. 34-1 at 27). Frontier argues that this is evidence that Arbitrator Vana subjected the ISP to arbitration. (ECF No. 34 at 27). Frontier further argues that this sentence "is nothing more than a thinly veiled and improper application of the Implied Covenant" because "the Arbitrator does not–because he cannot–identify any actual contract terms violated by the use of the ISP in this case." (*Id.*, n.13).

Contrary to Frontier's arguments, the very next paragraph of the Award and Opinion makes clear that Arbitrator Vana was not seeking to constrain the use of the ISP, but rather Frontier's ability to use contract labor as a cost-savings measure in the wake of an ISP-driven reduction in workforce. The language immediately following Frontier's extracted quote reads as follows:

> The question then becomes whether the Company's exercise of discretion in intentionally transferring work from the "surplus" Construction Techs, in the interest of expense reduction, was exercised in accordance with the White and Blue Book requirements? Article 13.1 provides a specific condition on the subcontracting of work…

> * * * *

> In the opinion of the arbitrator, Article 13.1 does not provide the Company the right to exercise its discretion to subcontract work for the sole purpose of reduction of expenses.

(ECF No. 34-1 at 27–28). Arbitrator Vana's bottom line is clear: Frontier can use the ISP on whomever it wants, but Article 13.1 restricts Frontier from thereafter contracting out the work of the departed Construction Techs where the sole purpose is cost savings.

The Court may or may not agree with Arbitrator Vana's reading of Article 13.1, but it is enough to say that the decision flows from his reading of that provision. *Hill*, 814 F.2d at 1195 (Once the court is satisfied that the arbitrator interpreted the agreement, "judicial review is at an end."). Frontier does not believe that Article 13.1 requires it "to hire a new employee to replace every employee voluntarily separating on an ISP if the Company was using contractors," (ECF

No. 34 at 29), but Arbitrator Vana believed that it did, at least on the facts of this case. This Court does not sit as a super-arbitrator, ready or willing to second guess the interpretation of a CBA. Arbitrator Vana's decision is based on his reading of the CBA, and that is enough to sustain it.

**c.**     *Footnote 43 did not Re-Write the CBAs*

Finally, Frontier takes exception to footnote 43 of the Award and Opinion, wherein Arbitrator Vana wrote:

> [43] The arbitrator notes that the Company in the past has not filled potential vacancies filled by attrition on a one for one basis, and the Company argues herein that it should not be required to fill the vacancies created by the departure of the Construction Techs that voluntarily accepted the May 2017 ISP.  The arbitrator finds that the reduction of Construction Techs through an ISP, initiated by the Company, is distinguishable from otherwise "routine" attrition. But for the Company's offer of the ISP, the affected Construction Tech's would have remained employed, and the work performed by them would have remained bargaining unit work. "Routine" attrition is not typical initiated by the Company.

(ECF No. 34-1 at 28). Frontier asserts that the CBAs created two kinds of separations: "voluntary separations, a/k/a attrition, and involuntary separations, a/k/a force adjustments." (ECF No. 34 at 29). In describing the ISP as "distinguishable from otherwise 'routine' attrition," Frontier asserts that Arbitrator Vana created a third kind of separation, in violation of the CBAs.

"[L]awyers and judges read footnotes, but it is equally true that lawyers and judges who draft documents place points in footnotes that they consider less important than the text of the document, and lawyers and judges who read those documents understand this." *United States v. Novak*, 2015 WL 720970 at *17 (N.D. Ill. Feb. 18, 2015). So it is here. At most, the footnote is an observation that an ISP differs from normal attrition in that it is initiated by the employer. This observation is both true and unremarkable. What it is not is relevant to the ultimate decision.

Again, Arbitrator Vana based his decision on his reading of Article 13.1, specifically what he viewed as a limitation on Frontier's right to use contract work in the first sentence of that Article. His decision did not turn on, or even consider, whether the Construction Techs departed

through "routine" or "non-routine" attrition. Indeed, in an earlier footnote Arbitrator Vana highlighted that the Construction Techs left their employment voluntarily. (ECF No. 34-1 at 26, n.41). If it had been otherwise, i.e., had they left under a force reduction, even Frontier would have conceded that the use of contractors was improper. (*See* ECF No. 34 at 6) ("The CBAs, thus, impose an express limitation on the Company's right to subcontract – it cannot do so when the contracting would "result in the layoff and/or part-timing of its employees customarily performing work of the same nature."). The footnote is irrelevant to Arbitrator Vana's ultimate findings and cannot be a basis for overturning the Award and Opinion.

**C.     Conclusion**

In the end, this case is not a dispute with a "runaway arbiter[]" where the "system breaks down completely." *See Dean v. Sullivan*, 118 F.3d 1170, 1171 (7th Cir. 1997). The arbitrator did not go rogue, rewrite the contract, or impose his own sense of industrial justice. The arbitrator expressed fidelity to the language of the CBAs and interpreted those contracts to the best of his ability.

A party's "choice to accept arbitration entails a trade-off." *Dean*, 118 F.3d at 1173. A party gains a "quicker, less structured way of resolving disputes" before a "specialized arbiter." *Id*. But in exchange, a party loses the "right to seek redress from the courts for all but the most exceptional errors at arbitration." *Id*. Frontier made that bargain, and this Court holds the Company to it.

For the foregoing reasons, the Union's Motion for Summary Judgment (ECF No. 35) is GRANTED. Frontier's Motion for Summary Judgment (ECF No. 33) is DENIED. The Clerk is DIRECTED to enter judgment in favor of Defendant and against Plaintiff.

SO ORDERED on May 4, 2021.

 s/ Holly A. Brady
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT